*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| LEE E. BAKER, JR., | ) |
| | ) Supreme Court Nos. S-18903/18983 |
| Appellant and | ) |
| Cross-Appellee, | ) Superior Court No. 3AN-13-05596 CI |
| | ) |
| v. | ) O P I N I O N |
| | ) |
| KENNETH M. DUFFUS, | ) No. 7769 – May 16, 2025 |
| | ) |
| Appellee and | ) |
| Cross-Appellant. | ) |
| | ) |

Appeals from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Michael Bedinger, Jones Bedinger, LLC, Anchorage, for Appellant and Cross-Appellee. Adam W. Cook and Zoe A. Eisberg, Birch Horton Bittner & Cherot, Anchorage, for Appellee and Cross-Appellant.

Before: Maassen, Chief Justice, and Carney, Borghesan, and Pate, Justices. [Henderson, Justice, not participating.]

BORGHESAN, Justice.

## I.     INTRODUCTION

Settlement funds held by the superior court were claimed by two parties: a creditor who obtained a charging order against distributions to the debtor by a limited liability company (LLC); and the debtor's law firm, which filed an attorney's lien against the funds. In a previous appeal we held that the attorney's lien was valid, but

remanded for the superior court to determine two issues: whether the settlement funds held by the court were LLC distributions subject to the charging order; and the value of the attorney's lien based on the amount the debtor owed the law firm for legal work performed in the matter.

On remand the superior court ruled that the funds were LLC distributions to the debtor and his law firm, and therefore subject to the charging order. The court also ruled that the debtor failed to prove that he owed his law firm any money for work performed in this matter, so the attorney's lien did not entitle the law firm to any of the settlement funds. After the superior court released the settlement funds to the creditor, apparently by mistake, it ordered the funds be returned pending appeal. The creditor returned the funds within two days, but the court awarded attorney's fees against the creditor as an apparent sanction for temporarily keeping the funds.

The debtor appeals, represented by the lien-holding firm. The creditor cross-appeals the attorney's fee award against him. We affirm the superior court's rulings on the merits but reverse the attorney's fee award.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

Lee Baker and Kenneth Duffus were business partners in a number of real estate ventures. Failure of two of these projects led to extensive litigation involving multiple appeals. Duffus obtained two judgments against Baker; only the 2013 judgment, discussed below, is relevant to this appeal.[1] Baker's sole significant asset was a 50% membership interest in Aurora Park, LLC, which he co-owned with his ex-wife, Patricia Baker. The LLC's sole relevant asset was the Aurora Park apartment complex (the Apartments) in Anchorage.

---

[1]     The other judgment was reversed in 2019. *Baker v. Duffus*, 441 P.3d 432 (Alaska 2019).

### 1. Marion Bowen litigation

In 2008 Duffus filed a lawsuit after Baker, among others, allegedly defaulted on a promissory note related to a parcel of land called Marion Bowen. The lawsuit resulted in Baker signing a confession of judgment agreeing to pay Duffus $150,000 plus 10.5% interest, compounded annually. To satisfy this judgment, Baker gave Duffus a "partial assignment of proceeds" from "any sale, conveyance, transfer or disposition" of the Apartments, which Duffus recorded on December 17, 2008. The parties agreed that Duffus could enforce the confession of judgment against Baker if the Apartments did not sell within five years.

In 2013 the Apartments still had not been sold and Baker still had not satisfied his debt to Duffus. Duffus sought to enforce the confession of judgment. The Marion Bowen court entered judgment in the amount of $252,585.06 in Duffus's favor. Duffus took no further relevant action for the next six years, later explaining that there had been no assets to collect on.[2]

### 2. Aurora Park litigation

A different dispute, initially separate from the Marion Bowen litigation, arose between Baker and Patricia Baker over management of Aurora Park. Patricia Baker and the company managing Aurora Park sued Baker for alleged violations of his fiduciary duty and failure to make mandatory capital contributions to Aurora Park. The parties settled in September 2018.

The settlement agreement set out various contingencies depending on whether Patricia Baker and Aurora Park could sell or refinance the Apartments by April 1, 2019. Under the contingency that was ultimately triggered, Baker quitclaimed his 50% interest in Aurora Park to Patricia Baker; Baker was to receive $50,000; and the law firm representing Baker, Jones Law Group (JLG), was to receive $250,000. Patricia Baker was to pay both Baker's $50,000 and JLG's initial $50,000 to JLG on

---

[2] *Duffus v. Baker*, 513 P.3d 264, 268 (Alaska 2022).

April 1, 2019, with subsequent $3,000 monthly payments to JLG until the remaining $200,000 was paid in full. The payments were deposited, by agreement, into the court registry.

Duffus was not involved in the settlement talks. After learning of the settlement agreement, he attempted to intervene in the Aurora Park litigation to obtain partial satisfaction of a separate judgment against Baker. The Aurora Park court ordered the settlement funds to be held in the registry pending resolution of the dispute. The Aurora Park court ultimately instructed Duffus to return to the court that issued the separate judgment to determine whether the funds could be distributed.[3] By July 2021, Aurora Park had deposited $300,000 in the court registry per the terms of the settlement agreement.

### 3. Distribution of settlement funds

Duffus filed two motions in the Marion Bowen court: one for execution of judgment based on the previously received 2013 judgment and an alternative one for a new charging order[4] against the Aurora Park settlement funds. By then, Baker's unpaid $150,000 confession of judgment from 2008, with interest, had ballooned to an outstanding debt of roughly $460,000.

---

[3] The court that issued the separate judgment stated that Duffus was entitled to the settlement funds paid to the court registry in connection with other litigation. However, we overturned the judgment associated with this ruling in May 2019 on procedural grounds and remanded the case for a new trial. *Baker*, 441 P.3d at 438.

[4] A judgment creditor of a limited liability company member may obtain a charging order to satisfy a judgment out of the judgment debtor's interest in the company. AS 10.50.380(a). A charging order functions as a lien on the judgment debtor's interest in the LLC. *See* AS 32.06.504(b) ("A charging order constitutes a lien on the judgment debtor's transferable interest in the partnership."); *see also Charging Order*, BLACK'S LAW DICTIONARY (12th ed. 2024) (A charging order is "[a] statutory procedure whereby an individual partner's creditor can satisfy its claim from the partner's interest in the partnership.").

The Marion Bowen court held a hearing in October 2019 and entered the requested charging order on December 9, 2019. The court directed Aurora Park to remit to Duffus "all the distributions of cash, profits, and assets of the company to which Mr. Baker or payees designated by Mr. Baker would otherwise be entitled." The court further provided that distributions included "any payment made by Aurora Park, LLC to Mr. Baker's attorney(s)," and that such payments "[could not] be made to Mr. Baker or his attorney(s) until the judgment is satisfied."

Shortly after issuing the 2019 charging order, the Marion Bowen court learned that an attorney's lien had been filed by JLG against the settlement funds in the court registry. The lien had not existed at the time of the October hearing: JLG perfected the lien and signed a Notice of Attorney's Lien on November 27, 2019. The court later concluded that the 2019 charging order had priority to the settlement funds deposited into the court registry before November 27 (the effective date of JLG's attorney's lien), while the attorney's lien had priority to any funds deposited on or after November 27. Consequently, the 2019 charging order had priority to approximately $122,000, while JLG was entitled to the approximately $128,000 that had yet to be deposited.[5]

Duffus appealed the Marion Bowen court's decision, arguing that the attorney's lien was invalid. Duffus further argued that even if the lien were valid, the 2019 charging order should be "equitably" prioritized over JLG's attorney's lien. Baker cross-appealed, arguing that the 2019 charging order was invalid. Baker further argued that even if the charging order were valid, the settlement funds did not constitute a distribution subject to the charging order.

---

[5] Baker was to receive the remaining $50,000 under the terms of the settlement agreement.

In deciding the appeal, we explained that "[c]harging orders give 'judgment creditor[s] . . . only the rights of an assignee of the member's interest.' "[6] Assignees may receive "only the distributions to which the assignor is entitled."[7] We thus concluded that as a judgment creditor, Duffus could receive "only distributions to which [Baker] is entitled."[8] At the same time, we concluded that while JLG's attorney's lien was valid, it could "extend only to the services rendered in the Aurora Park lawsuit."[9] And there was insufficient evidence that the $250,000 to be paid to JLG was owed for services rendered in the Aurora Park lawsuit.[10] Accordingly, we remanded the case to the superior court to hold an evidentiary hearing to determine: (1) whether the settlement funds were a distribution originating from Aurora Park, and (2) the amount of attorney's fees secured by the lien.[11]

## B. Proceedings On Remand

Following a two-day evidentiary hearing, the Marion Bowen court issued findings of fact and conclusions of law. The court made three key rulings: (1) the funds at issue were an "interim distribution" traceable to Aurora Park; (2) JLG's attorney's lien had no value for lack of evidence; and (3) Duffus's 2008 partial assignment held priority over JLG's attorney's lien. The court concluded that Duffus was entitled to receive all $300,000 in the court registry.

---

[6] *Duffus*, 513 P.3d at 271 (second and third alterations in original) (quoting AS 10.50.380(b)).

[7] *Id.* (quoting AS 10.50.375(b)).

[8] *Id.* (alteration in original).

[9] *Id.* at 275.

[10] *Id.*

[11] *Id.* at 272, 275-76.

### 1. Findings of fact and conclusions of law

The Marion Bowen court first addressed whether the settlement funds constituted a distribution from Aurora Park. The court noted that the settlement agreement between Aurora Park and Baker "[did] not describe the money paid to . . . Baker and his attorneys as a 'distribution.' " However, the court explained that "what the agreement sa[id]" was not dispositive because "the parties were attempting to craft the agreement in a way that avoided the 2019 Marion Bowen charging order held by Mr. Duffus." The court then rejected Baker's argument that the court should use a narrower definition of "interim distribution" purportedly adopted in Aurora Park's operating agreement.[12] The court explained that the Alaska Revised Limited Liability Company Act (Alaska LLC Act) "does not authorize LLCs to deviate from the statutory definition of 'interim distribution.' " The court reasoned that if "the LLC members could contractually redefine something statutorily described as a 'distribution' as [instead] 'not a distribution,' it would allow them to evade the charging order statute, which is 'the exclusive remedy that a judgment creditor of a member or member's assignee may use' to collect on a judgment."[13] Consequently, the court concluded that the statutory definition of "interim distribution" applied.[14]

The court then determined that the $300,000 settlement payment constituted an interim distribution from Aurora Park, LLC. It first found that the Aurora Park settlement agreement was an agreement for Baker to relinquish his interest in the LLC in exchange for a $300,000 payment to him and JLG. The court then rejected Baker's contention that the funds were paid by Patricia Baker individually. The court

---

[12]    The relevant provision of the operating agreement is quoted below in Section IV.A.1.

[13]    AS 10.50.380(c).

[14]    The court concluded that the settlement funds were an interim distribution, rather than a final distribution, because Aurora Park, LLC was not in the process of dissolution and winding up. The parties do not dispute this conclusion.

relied on copies of checks and testimony from Patricia Baker to support its finding that the $300,000 was traceable solely to Aurora Park, LLC. The court also credited Patricia Baker's testimony that she executed a confession of judgment "*only* to serve as a guarantor in the event that Aurora Park, LLC could not or did not pay." Considering all of the evidence, the court concluded that the funds were "paid as an 'interim distribution' as defined in the Alaska LLC Act, from Aurora Park, LLC to Mr. Baker." Therefore, the 2019 Marion Bowen charging order could attach to the settlement funds.

Next, the superior court determined that the attorney's lien did not give JLG a claim on any of the settlement funds because Baker and JLG produced "insufficient evidence to determine the value of JLG's attorney lien." The court noted our previous suggestion that Baker produce evidence "such as fee agreements and billing records."[15] The court pointed out that "neither Mr. Baker nor [his attorney], who testified as a witness, could produce a fee agreement . . . or any billing records for the Aurora Park litigation" at the evidentiary hearing even though "[t]he timely creation and retention of such documents by law practices is routine, unremarkable, and mandated by the ethical rules." Steve Jones, Baker's attorney, did provide a document containing time entries made by JLG, but the court concluded that this "[did] not serve as evidence of any amount actually owed." The court indicated that absent a fee agreement or billing records, "the $250,000 figure could have simply been the amount agreed to during the Aurora Park settlement." The court found that Baker's and Jones's testimony that Baker had agreed to pay JLG for the work performed in the Aurora Park litigation was not credible, so the lien did not secure any of the funds in the registry.

The court concluded, in the alternative, that the lien was invalid because Patricia Baker had executed a novation in the settlement agreement, making her

---

[15] *Duffus*, 513 P.3d at 275.

personally responsible "for the payment of the $250,000 in legal fees allegedly owed by Mr. Baker to JLG."

After addressing the two questions we posed on remand, the superior court reasoned that it was ultimately unnecessary to calculate the value of the attorney's lien and to determine whether the payments to the court registry were distributions subject to the 2019 charging order. This was so, the court explained, because the Aurora Park settlement triggered the 2008 partial assignment of proceeds that Baker gave Duffus. According to the superior court, this assignment of proceeds took priority over JLG's attorney's lien under Uniform Commercial Code (UCC) § 9-333.

Based on these rulings, the court ordered the court clerk to disburse the $300,000 in the court registry to Duffus in partial satisfaction of the 2008 partial assignment.

### 2. Second final judgment

The Marion Bowen court entered a final judgment on this matter on October 31, 2023, granting Duffus $300,000. Duffus and Baker filed a joint motion for reconsideration, arguing that a final judgment had already been entered in this case in 2013 — when Duffus sought to enforce Baker's confession of judgment — and that more recent litigation merely constituted post-judgment proceedings. Both parties argued that Alaska Rule of Civil Procedure 58 only allows for a single final judgment, and that the second final judgment may "double-count[]" the debt and create a new liability for $300,000.

The court denied the motion. In a single-page order, the court wrote: "With due consideration and review of Mr. Baker's motion, the court does not perceive any persuasive reason to grant reconsideration."

### 3. Attorney's fee award against Duffus

A dispute arose over when the funds in the court's registry should be released. The October 5, 2023 findings of fact and conclusions of law had stated: "[It] is hereby ORDERED that the Clerk of Court is to pay the $300,000 currently in the

Registry of the Court to Mr. Duffus, in partial satisfaction of the Partial Assignment of Proceeds recorded December 17, 2008." On October 11, 2023, the court issued a separate order stating that "[a]ctual release of the funds requires Mr. Duffus [to] file a motion to release the funds." The order also provided that the court would "allow ten days for any opposition prior to ruling on the motion."

Duffus filed a motion for release of funds the same day. Baker filed a motion for extension of time to oppose the release of funds on October 23. On October 25, without ruling on Baker's motion, the court released the $300,000 to Duffus. On October 26 Baker filed a motion to stay the judgment pending his appeal and to waive the requirement that he post a supersedeas bond. Duffus argued in response that the issue was moot because the funds had already been released and that there was no procedural basis for delaying the release of funds.

On November 1 the court issued an order stating that it would defer ruling on Baker's motion to stay until liabilities for attorney's fees, costs, and prejudgment interest were finally established. Noting how long the case had been litigated, the court speculated that the total judgment might increase "to over $500,000, meaning that the funds in the court registry would fall substantially short of compensating Mr. Duffus." Consequently, the court reasoned that "[a] supersedeas bond to supplement the funds in the registry may be necessary to protect Mr. Duffus'[s] full interest in collecting the final judgment."

On November 3 Baker filed a motion to compel the immediate return of the funds to the court registry, arguing that the court had mistakenly distributed the funds. The court granted this motion on November 14, ordering Duffus to return the funds plus interest and permitting Baker to seek "attorney's fees incurred in filing his motion." Duffus returned $300,000 to the court registry two days later.

Baker moved for $2,820 in attorney's fees, arguing that the attorney's fees incurred in litigating the motion to compel the return of the funds were caused by Duffus's refusal to voluntarily return the funds. Duffus opposed the motion, arguing

that the funds had been released pursuant to the court's own order. Baker replied, arguing that Duffus was at fault for accepting and keeping the funds when they had been released in "obvious error." The court awarded the fees to Baker without explanation.

### 4. Appeal

Baker appeals the court's findings that the funds were an interim distribution and that the value of the attorney's fee lien was not proved. Both parties appeal the court's entry of a second final judgment. Duffus cross-appeals the award of attorney's fees against him.

## III. STANDARD OF REVIEW

Charging orders, attorney's liens, and priority of secured debts are governed by statute.[16] "The question of priority is a legal one, to which we apply our independent judgment."[17] We also consider questions of statutory interpretation using our independent judgment.[18] "Whether the settlement funds count as LLC distributions under Alaska law is a mixed question of law and fact."[19] The applicability of a statute

---

[16]    *See* AS 10.50.380 (detailing Alaska's charging order rules); *see also* AS 34.35.430 (delineating attorney's lien rules); AS 45.29.101–.811 (codifying UCC article 9, governing priority of secured debts).

[17]    *Falconer v. Adams*, 20 P.3d 583, 584 (Alaska 2001).

[18]    *Mat-Su Valley Med. Ctr., LLC v. Bolinder*, 427 P.3d 754, 762-63 (Alaska 2018); *Anderson v. Alyeska Pipeline Serv. Co.*, 234 P.3d 1282, 1286 (Alaska 2010) ("[W]e interpret the statute according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose.").

[19]    *Duffus*, 513 P.3d at 270; *cf. Bilbao v. Bilbao*, 205 P.3d 311, 313 (Alaska 2009) ("A trial court's characterization of property as separate or marital may involve disputed facts and questions of law.").

is a question of law that we review de novo, while underlying findings of fact are reviewed for clear error.[20]

"We review de novo a superior court's interpretation of court rules, and exercise our independent judgment in interpreting court rules."[21] "Under the independent judgment standard we adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[22]

"We review an award of attorney's fees under an abuse of discretion standard."[23] "The trial court has broad discretion in awarding attorney's fees."[24] "[We] will not find an abuse of discretion absent a showing that the award was arbitrary, capricious, manifestly unreasonable, or stemmed from improper motive."[25]

## IV.  DISCUSSION

The main issue in this appeal is the same as in the last one:  whether Duffus or JLG is entitled to the Aurora Park settlement funds.  Duffus has a secured interest in any distributions to which Baker was entitled from Aurora Park, and JLG has a valid attorney's lien for services rendered in the Aurora Park lawsuit.  In the previous appeal, we remanded for the superior court to determine the value of JLG's attorney's lien and whether the settlement funds were a distribution from Aurora Park.  The superior court determined that the settlement funds were a distribution from Aurora Park under Alaska

---

[20]     *Duffus*, 513 P.3d at 270; *see also Rockstad v. Erikson*, 113 P.3d 1215, 1219 (Alaska 2005) ("We review a trial court's rulings on questions of law, and the application of law to fact, de novo . . . .").

[21]     *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 204 P.3d 1023, 1026 (Alaska 2009) (footnote omitted).

[22]     *Id.*

[23]     *Oakly Enters., LLC v. NPI, LLC*, 354 P.3d 1073, 1079 (Alaska 2015) (quoting *Ware v. Ware*, 161 P.3d 1188, 1192 (Alaska 2007)).

[24]     *Id.*

[25]     *Id.*

LLC law. The court also found that Baker and JLG failed to prove that the attorney's lien had any value.

We first conclude that the superior court correctly applied the statutory definition of distribution, did not clearly err in making its factual determinations, and did not err in its ultimate conclusion that the settlement payment was a distribution from the LLC. We also conclude that the court did not clearly err in finding that the attorney's lien had no proven value. As to the court's procedural rulings, we hold that the second final judgment and attorney's fee award were issued in error.

A. **The Superior Court Did Not Err In Concluding That The Funds Paid Into The Court Registry Were Distributions Of Aurora Park, LLC, Subject To The Charging Order.**

1. **The superior court correctly applied the statutory definition of "interim distribution."**

Baker first contends that the superior court should have applied the operating agreement's definitions of distributions, rather than the statutory definitions. Baker argues that had the court applied the operating agreement's definitions, it would have concluded that the payments to JLG were not interim distributions because they were not paid out in the manner provided by the agreement. But we see no error in the superior court's ruling.

The Alaska LLC Act governs distributions by an LLC.[26] An interim distribution is "a distribution of the assets of a limited liability company to the company's members."[27] A final distribution occurs as part of the dissolution and winding up process and entails the distribution of company assets to certain parties in order of priority.[28] The Act permits LLCs to make their own provisions for these

---

[26]    AS 10.50.295–.348 (governing interim distributions); AS 10.50.425 (governing final distributions).

[27]    AS 10.50.990(8).

[28]    AS 10.50.425.

distributions. For example, AS 10.50.295 states that a company "shall make the [interim] distribution to the members in the manner provided in an operating agreement of the company."[29] An LLC also has the discretion to "authorize different interim distributions for different classes of members."[30]

Although Alaska LLC law gives an individual LLC flexibility in determining the "manner" in which distributions are made, we noted in the previous appeal that "the laws may not necessarily give an LLC the flexibility to change the definition of a distribution."[31] Neither the Act's definition of "interim distribution" nor its provision allowing LLCs to determine the "manner" of distribution suggest an LLC may adopt its own definition of "distribution."[32] Indeed, allowing LLCs to do so would undermine the statutory scheme. A company could adopt a narrower definition of "interim distribution" to prevent creditors from obtaining a charging order, the only remedy that allows them to reach the assets of a debtor that are tied up in an LLC.[33] Therefore, we remain skeptical that Alaska law permits an LLC to define, through its operating agreement, what payments count as interim distributions.

But we need not decide that issue because the Aurora Park operating agreement does not even purport to change the definition of an "interim distribution." Section 5 of Article IX of the operating agreement provides:

> From time to time, the Manager shall determine in his sole and absolute judgment to what extent, if any, the Company's cash on hand exceeds the current and anticipated needs,

---

**29** AS 10.50.295.

**30** *Id.*

**31** *Duffus v. Baker*, 513 P.3d 264, 272 (Alaska 2022) ("Alaska laws give an LLC flexibility to deviate from the default requirement of paying each member an equal share of distributions, but the laws may not necessarily give an LLC the flexibility to change the definition of a distribution.").

**32** AS 10.50.990(8); AS 10.50.295.

**33** AS 10.50.380(c).

including, without limitation, needs for operating expenses, debt service, reserves, and additional capital expenses. To the extent such excess exists, the Manager with consent of all of the Members may make distributions to the Members in accordance with their Sharing Ratios. Such distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Manager.

Although we previously characterized this provision as "defin[ing] 'interim distribution,' " it is more precise to say that the provision describes the *manner* in which these distributions are to be made.[34] The language of the provision indicates when distributions may be made (at the Manager's discretion, if the Company's cash on hand exceeds the current and anticipated needs), what procedural steps must be taken (the Manager must obtain the consent of all members), and the form distributions must take (cash or property, or partly in both). These requirements do not purport to redefine whether a transfer of assets does or does not qualify as an interim distribution.

For that reason we see no error in the superior court's use of the statutory definition of "interim distribution" to determine whether the payments to JLG qualified as such.

### 2. The superior court did not clearly err in making its factual findings.

The superior court made two key findings in reaching its conclusion that the settlement funds were paid as an interim distribution. Neither of these findings is clearly erroneous.

First, the court found that the Aurora Park settlement agreement was an agreement for Baker to relinquish his interest in the LLC in exchange for a $300,000 payment to him and JLG. This finding is supported by the transfer agreement between Baker and Patricia Baker, which states that "[p]ursuant to the Settlement

---

[34] *Duffus*, 513 P.3d at 272.

Agreement . . . Lee Baker hereby assigns, conveys[,] and transfers to Pat Baker his Percentage Interest in Aurora Park." The transfer agreement further states that upon execution of the agreement, Patricia Baker would own 100% of Aurora Park. Baker confirmed during the evidentiary hearing that he understood that he transferred his membership interests in Aurora Park to Patricia Baker as part of the settlement. As Baker received $50,000 and JLG received $250,000 under the settlement agreement, the court did not clearly err in finding that these funds were payment for his share of the LLC's assets.

Second, the court found that the funds were paid by Aurora Park, LLC, not by Patricia Baker individually. Although Patricia Baker agreed to execute a confession of judgment, she testified that Baker had requested one from her because he believed Aurora Park may not have had enough money to pay him. That is, Patricia Baker served as an independent guarantor that Aurora Park would meet its obligation. However, all of the $300,000 currently in the court registry is traceable solely to the LLC. Aurora Park deposited $178,000 into the court registry using funds from the company's trust account. Patricia Baker testified with regards to this amount, "Everything flowed into the Aurora Park operating account, and then it went out to the court." The remaining $122,000 was paid from money held in escrow following the sale of the Apartments by Aurora Park. Patricia Baker confirmed at the evidentiary hearing that Aurora Park made the $3,000 monthly payments to JLG. She also confirmed that she did not personally contribute any of the money. Therefore, we see no clear error in the court's finding that Patricia Baker did not personally contribute any of the $300,000.

**3.    The superior court did not err in concluding that the $300,000 in the court registry was paid as an "interim distribution" from Aurora Park, LLC to Baker.**

Baker also argues that the funds paid pursuant to the settlement agreement do not meet the statutory definition of "interim distribution." But we do not find his arguments persuasive.

First, Baker contends that he was not a member of Aurora Park when the charging order was issued. Baker transferred his interest in the spring of 2019, but the charging order was not issued until December 2019. Baker argues that AS 10.50.380(a) permits a court to charge only a "member's limited liability company interest" for payment of the unsatisfied judgment amount, not a nonmember's or former member's interest in the LLC.

Baker is mistaken. These payments are distributions to Baker because his right to these payments vested, at the latest, when he quitclaimed his interest in the LLC in exchange for the right to receive them.

The Bakers' settlement agreement provided that Patricia Baker would attempt for six months to refinance the property at the highest value possible and conditioned payments based on four potential outcomes. Patricia Baker testified at the evidentiary hearing that as the refinancing deadline approached, the company was still struggling to refinance the Apartments. Accordingly, on March 22, 2019, she wrote a check to the clerk of court for $100,000 — the initial $50,000 payments to Baker and JLG required under the settlement agreement. The Bakers executed the transfer agreement on April 3, 2019.

Baker's right to future payments vested when it proved impossible to refinance the property, which triggered his and Patricia Baker's promises to exchange

his interest in the LLC for $300,000 in payments.[35] Alternatively, his right to the payments vested when he actually quitclaimed his interest in the LLC to Patricia Baker on April 3, 2019, in accordance with their agreement.

Either way, these payments were distributions of Aurora Park, LLC's assets to one of its members. As we explained in the previous appeal, "[s]tructuring the settlement as monthly installments occurring in part after Baker transferred his Aurora Park interest rather than as a lump sum does not meaningfully impact the analysis."[36]

Second, Baker argues that the $250,000 payment flowing directly to JLG is not an interim distribution because JLG was not a company member. This argument glosses over the substance of the transaction memorialized in the settlement agreement.

The payment to JLG is essentially an assignment of Baker's rights in the settlement funds to JLG.[37] The only conceivable possibility for why Aurora Park, LLC would pay $250,000 to JLG — the opposing counsel in the Aurora Park litigation — is that Baker intended the funds to pay JLG for its legal representation of Baker. Baker does not point to any evidence suggesting there was separate consideration for Aurora Park to make a $250,000 payment to JLG, and we see no such evidence in the record. Including JLG in the agreement constituted an implicit assignment of Baker's right to receive the distribution. Baker and JLG cannot avoid Duffus's charging order simply

---

**35** *See* 13 WILLISTON ON CONTRACTS § 38:1 (4th ed. 2024) ("If the condition is not fulfilled, the right to enforce the contract does not come into existence."); RESTATEMENT (SECOND) OF CONTRACTS § 224 (AM. L. INST. 1981) ("A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.").

**36** *Duffus*, 513 P.3d at 272 n.40.

**37** *See* 6A C.J.S. *Assignments* § 2 (2024) ("An 'assignment' is the transfer of some identifiable property, claim, or right from the assignor to the assignee.").

by structuring the settlement agreement to avoid mentioning the assignment of Baker's rights in the distributions to JLG.[38]

The settlement agreement was a buy-out of Baker's interest in Aurora Park authorized under Article XII of the operating agreement. Baker received $300,000 from the company in exchange for his membership interest. We therefore conclude that the superior court made no errors in determining that the settlement payment to Baker from Aurora Park was an interim distribution and that the payment was subject to the 2019 charging order.

**B.      The Superior Court Did Not Clearly Err In Finding That Baker And JLG Failed To Prove The Value Of The Attorney's Lien.**

An attorney has a lien for compensation "upon money in the possession of the adverse party in an action or proceeding in which the attorney is employed, from the giving of notice of the lien to that party."[39] The lien "gives an attorney the right to have fees and costs due to the attorney for services in a particular suit secured by the judgment or recovery in such suit."[40] Such a lien "extends only to charges and fees in the suit in which the judgment was obtained."[41]

A party seeking to enforce an attorney's lien must present evidence to support the fee calculation.[42] For instance, in *Law Offices of Steven D. Smith, P.C. v. Ceccarelli*, we reversed the foreclosure of an attorney's lien on summary judgment and

---

[38]      *See id.* § 5 ("Whether or not a transfer of a particular right or interest is an assignment or instead some other transaction depends, not on the name by which it is called, but on the legal effect of the transfer's provisions.").

[39]      AS 34.35.430(a)(3).

[40]      *L. Offs. of Steven D. Smith, P.C. v. Ceccarelli*, 385 P.3d 841, 844 (Alaska 2016).

[41]      23 WILLISTON ON CONTRACTS § 62:11 (4th ed. 2024).

[42]      *See L. Offs. of Steven D. Smith, P.C.*, 385 P.3d at 846.

remanded the matter for factual findings on the amount due because there was no evidence supporting the fee calculation apart from the attorney's pleadings.[43]

Baker contends that the value of JLG's attorney's lien is $250,000. In the last appeal, Baker pointed to the following evidence supporting the lien: (1) the complaint in the Aurora Park litigation, (2) the settlement agreement, (3) a charging order issued in a separate case in 2017, and (4) Baker's assertions that he owed JLG $250,000 for services in the Aurora Park litigation.[44] Describing this evidence as "scant, at best," we explained that JLG's attorney's lien "extend[s] only to the services rendered in the Aurora Park lawsuit" and that Baker had not presented any evidence establishing the amount owed other than his own assertions.[45] We invited Baker to produce "more evidence outside of [his] assertions, such as fee agreements and billing records," to establish the amount he owed JLG for legal services rendered in the Aurora Park lawsuit.[46]

But on remand, Baker did not produce a fee agreement or any billing records for the Aurora Park litigation. While Baker testified that he had signed a fee agreement with JLG for the case, he also stated that he did not have a copy of the agreement because it is his general practice to discard documents "when the issue is over." And although Baker testified that JLG had sent him invoices, he did not produce them at the hearing.

Jones, Baker's attorney, was also unable to produce documentation confirming the amount Baker owed JLG. Jones testified that Baker had signed a fee agreement, but that no hard copies of the agreement still existed. He added that he could not locate the electronic version of the agreement, likely because of a handling

---

[43]    *Id.* at 842, 846-47.

[44]    *Duffus v. Baker*, 513 P.3d 264, 275 (Alaska 2022).

[45]    *Id.*

[46]    *Id.*

error. Jones testified that JLG's bookkeeper would have sent Baker invoices, but he had no record of them. Jones produced a spreadsheet containing itemized descriptions of the tasks performed by JLG, the time spent on each task, the total number of hours spent working on the Aurora Park case, and the hourly rates for the attorneys doing the work. Jones testified that the itemization reflected actual bills sent to Baker, that JLG expected to be paid, and that Baker did not pay JLG. But, as the superior court noted, the document did not establish what amount Baker actually *owed* to JLG.

After hearing this evidence, the superior court concluded that Baker had not proved that he owed JLG any money for work performed in the Aurora Park litigation and therefore ruled that the attorney's lien did not secure any of the settlement funds in the court registry.

Baker challenges this ruling, arguing that substantial testimony shows that the amount listed in the itemized spreadsheet was actually the amount owed. Baker also argues that the fact that Patricia Baker had agreed to pay most of Baker's legal bills as part of the Aurora Park settlement is strong evidence that the ultimate settlement amount, $250,000, was meant to approximate the alleged $253,653.50 amount Baker owed JLG.

We are not left with a definite and firm conviction that the superior court clearly erred in finding Baker's and Jones's testimony was "not credible or probative." The superior court correctly noted that despite Baker's and Jones's assertions that there was a fee agreement and that JLG sent Baker invoices, likely monthly, over the course of the Aurora Park litigation, neither Baker nor Jones was able to produce a single document showing an agreement to pay JLG or an amount due to JLG. Indeed, neither could produce even a single document showing that JLG had ever requested payment of any kind from Baker — "not an email, not a letter, not a text message, not a memorandum," as the court put it. While we do not conclude that the only relevant evidence Baker could have produced was the fee agreement or billing records, we echo the superior court's statement that "[t]he timely creation and retention of such

-21-                                                7769

documents by law practices is routine, unremarkable, and mandated by the ethical rules," and that their absence is noteworthy here. We therefore conclude that it was not clearly erroneous for the superior court to discount the credibility of Baker's and Jones's testimony for failing to produce these documents.

Nor do we believe that the superior court clearly erred in finding that the stated amount of the attorney's lien, $250,000, reflected "the amount agreed to during the Aurora Park settlement" rather than an amount Baker actually owed JLG for work in the Aurora Park litigation. As noted above, Baker and JLG did not present credible evidence that Baker *owed* JLG a $250,000 debt for work performed in the Aurora Park litigation. Baker and JLG may simply have agreed that JLG was entitled to whatever amount it was able to obtain through settlement. As the superior court noted, Patricia Baker testified that neither Jones nor any other employee at JLG had ever told her at mediation how much Baker owed JLG for the work done in the Aurora Park case. Patricia Baker further testified that the proposed settlement amount "kept changing," and that JLG "threw around a lot of numbers." She later testified that she was "blown away" by the $250,000 figure, and that she and Baker "never dreamed that the actual cost of [the legal work] was $250,000." She added, "There wasn't enough legal work done to cover that." When asked about the amount of the lien, Jones testified, "Ms. Baker would agree to only $250,000. That's why the attorney's fee lien was for $250,000. That's what's in the settlement document, so that's what the attorney's lien is for." Jones did later state that the number came both from what Aurora Park agreed to pay and from JLG's review of billing records. But determining a witness's credibility is the trial court's responsibility in a bench trial.[47] Reviewing the testimony from Patricia Baker and Jones, we cannot say that it was clearly erroneous for the superior

---

[47] *Hallam v. Alaska Airlines, Inc.*, 91 P.3d 279, 284-85 (Alaska 2004).

court to conclude that the settlement amount was not evidence of the actual amount Baker owed JLG.[48]

Baker also argues that because AS 34.35.430(a) gives an attorney a lien for compensation that is either "specially agreed upon or implied," evidence showing the value of work JLG performed in the suit is enough to establish that the attorney's lien secured that amount of funds. But even if an attorney's right to compensation may be implied, it remains true that the lien attaches only to funds "*due to the attorney* for services in a particular suit."[49] Because we cannot say the superior court clearly erred in finding that Baker did not prove he owed JLG any money for services rendered in the Aurora Park suit, we affirm its ruling that the lien did not entitle JLG to any of the settlement funds in the court registry.

### C. It Was Error To Enter A Second Final Judgment.

Two final judgments have been issued in this case. The superior court entered the first final judgment against Baker on March 11, 2013, when Duffus sought to enforce Baker's confession of judgment under Alaska Civil Rule 57(b).[50] The amount of this judgment, including interest, now exceeds the Aurora Park settlement

---

[48] Because we conclude that the superior court did not clearly err in finding that Baker and JLG had failed to prove the value of the attorney's lien, we do not address the superior court's alternate ruling that the lien had no value because Patricia Baker had executed a novation in the settlement agreement. Nor do we address the superior court's other alternate ruling that Duffus's 2008 assignment had priority over JLG's attorney's lien.

[49] *L. Offs. of Steven D. Smith, P.C. v. Ceccarelli*, 385 P.3d 841, 844 (Alaska 2016) (emphasis added).

[50] Civil Rule 57(b) provides: "On the confession of the defendant, with the assent of the plaintiff or the plaintiff's attorney, a judgment may be given against the defendant in any action, for any amount not exceeding or relief different from that demanded in the complaint." Alaska R. Civ. P. 57(b)(1).

fund of $300,000. The superior court authorized execution on this final judgment on April 18, 2013.[51]

After the most recent proceedings, the court entered a final judgment, dated October 31, 2023, in Duffus's favor in the amount of $300,000. Both parties moved for reconsideration, arguing that the second final judgment was not required and potentially created a new liability for $300,000 by "double-count[ing]" the debt. The superior court denied the motion, stating that it "[did] not perceive any persuasive reason to grant reconsideration."

Civil Rule 58 provides that a court must enter a judgment "upon a decision by the court that a party shall recover only a sum certain or costs or that all relief shall be denied."[52] The purpose of the recent proceedings was to determine whether the $300,000 deposited in the court registry was subject to the April 18, 2013 execution order. The court's October 5, 2023 determination that the $300,000 held in the court registry should be given to Duffus was not a decision by the court that Duffus "shall recover only a sum certain or costs," but rather a determination that the settlement funds deposited in the court registry were subject to the 2013 order, and that the funds therefore should be delivered to Duffus as partial satisfaction of that judgment.[53] This ruling created no new liability, so no new final judgment should have been issued. We therefore vacate the October 31, 2023 final judgment.

---

[51] The execution on the final judgment was authorized under Alaska Civil Rule 69, which provides that the "[p]rocess to enforce a judgment shall be by a writ of execution, unless the court directs otherwise." Alaska R. Civ. P. 69.

[52] Alaska R. Civ. P. 58.

[53] *See* Alaska R. Civ. P. 67 ("Upon notice to every other party and upon leave of court, a party may deposit with the court all or any part of any sum of money or any other thing capable of physical delivery which is the subject of the action or due under a judgment . . . . The court shall release the deposit to the party entitled to it when that party becomes entitled to it.").

**D. The Attorney's Fee Order Against Duffus Was An Abuse Of Discretion.**

Duffus appeals the superior court's award of $2,820 in attorney's fees to Baker in its January 9, 2024 order. Duffus argues that the superior court appears to have "improperly sanctioned [him] for *compliance* with [the terms of] its prior orders." Because the superior court did not cite a specific court rule or otherwise explain the basis for its decision, Duffus contends that the court must have issued the award under Alaska Civil Rule 95, which allows the court to award attorney's fees as a sanction for court rule violations.[54]

"[W]hen assessing attorney's fees under Rule 95(a), the superior court must provide an explanation of its reasons for assessing the fees."[55] This requires a showing that counsel or parties have violated the Alaska Rules of Civil Procedure.[56] Although "the best practice is to specify which rule an attorney has violated," an order imposing sanctions may be upheld "if the violation can be gleaned from the text of the order."[57]

The order awarding Baker attorney's fees did not specify any rule Duffus or his attorney violated or otherwise explain why the fees had been assessed. The order states only: "Defendant Lee E. Baker, Jr. is awarded a total of $2,820 for attorney's fees necessarily incurred in litigating Plaintiff Kenneth M. Duffus's return of funds to the court registry." Nor is it apparent what rule Duffus may have violated. The October 5, 2023 findings of fact and conclusions of law ordered the court clerk to pay the settlement funds to Duffus. The October 11, 2023 order stated that Duffus was required

---

[54] Baker cited Civil Rule 95 in his reply on the motion for attorney's fees.

[55] *In re Schmidt*, 114 P.3d 816, 826 (Alaska 2005).

[56] *Id.* at 820-22.

[57] *Id.* at 822 (discussing *Stephenson v. Superior Ct., Fourth Jud. Dist.*, 697 P.2d 653 (Alaska 1985)).

to file a motion in order for the funds to be released. Duffus filed that motion. The court then released the funds. Duffus returned the funds to the court two days after the court granted Baker's motion to compel immediate return of the funds to the court registry. There is no indication that Duffus violated any court order or any rule in this sequence of events. Because there is no apparent reason for the sanction, we vacate the order awarding attorney's fees to Baker.

## V. CONCLUSION

We AFFIRM the superior court's October 5, 2023 findings of fact and conclusions of law. We VACATE the superior court's October 31, 2023 final judgment. We VACATE the January 9, 2024 order awarding attorney's fees to Baker.